**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

MICHAEL ONTIVEROS-YARBROUGH,

Plaintiff,

v.

CAROLYN W. COLVIN,

Acting Commissioner of Social Security,

Defendant.

Case No.  1:15-cv-00798-SKO

**ORDER RE PLAINTIFF'S SOCIAL SECURITY APPEAL**

## I.   INTRODUCTION

Plaintiff, Michael Ontiveros-Yarbrough ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplement Security Income ("SSI") Benefits pursuant to Title XVI of the Social Security Act. 42 U.S.C. § 1381-83.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.   FACTUAL BACKGROUND

Plaintiff was born on March 15, 1993, and alleges disability beginning on January 19, 2009.  (Administrative Record ("AR") 13; 208-09.)  Plaintiff claims he is disabled due to paranoid schizophrenia and auditory halluciantions.  (*See* AR 223.)

---

[1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6; 8.)

**A.      Relevant Medical Evidence[2]**

On July 15, 2009, Dr. Sugnaykumar P. Patel, M.D., examined Plaintiff after referral from his primary care provider.  (AR 285-92; 422-26.)  Dr. Patel noted a history of substance abuse, including marijuana, hashish, and "club drugs" such as ecstasy, "poppers," and GHB and reported Plaintiff had used these drugs a "few times" in the preceding weeks.  (AR 286; 291.)  Plaintiff's description of his symptoms was "vague, confused and circumstantial" and Plaintiff's mother reported he was acting "strange," mumbling to himself, and had put towels over the blinds on the windows.  (AR 286.)

On examination, Plaintiff had "psychomotor retardation," a guarded, aloof and withdrawn manner, rambling speech, anxious mood, restricted and blunted affect, disorganized thought process, paranoid ideation, audio hallucinations, distractible attention, and impaired concentration.  (AR 287.)  Plaintiff's impulse control, insight and judgment, however, were all fair, his fund of knowledge was normal, his memory was intact, he was fully oriented, and he was healthy and appropriately dressed (AR 287). Dr. Patel diagnosed Plaintiff with psychotic disorder and substance induced psychotic disorder.  (AR 285.)  Plaintiff was prescribed Seroquel, a drug used to treat schizophrenia.  (AR 288.)  Dr. Patel assessed Plaintiff with a GAF[3] score of 51-60, reflecting only "moderate" symptoms.  (AR 288.)

On January 4, 2010, Plaintiff was examined by licensed social worker Susan Seruby, LCSW, for sleep medication.  (AR 296-301.)  Plaintiff reported sleeping poorly for "several days" and experiencing audio and visual hallucinations, reporting that had not taken his prescribed Seroquel out of fear of how the medicine would interact with marijuana.  (AR 296.)  Plaintiff reported using marijuana two days prior, but claimed his use of marijuana and alcohol was "to deal with the voices and hallucinations" and that he "wants to stop the use." (AR 296.)  Plaintiff's

---

[2]    Under the regulations, Plaintiff would only be eligible to receive SSI benefits beginning on November 4, 2011, one month after his initial filing date.  20 C.F.R. § 416.335.  Though the Commissioner is only required to develop the medical history for twelve months preceding the month of the application, *see* 20 C.F.R. § 416.912(d), the ALJ reviewed and discussed the entire record and the full record will therefore be reviewed in this order.

[3]    The Global Assessment of Functioning (GAF) scale score is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults.  DSM-IV-TR at 34.

mother told Ms. Seruby that Plaintiff was "a good boy" who "just need[ed] medication to help him manage." (AR 296.) Plaintiff denied suicidal or homicidal intent and did not qualify for hospitalization. (AR 296.) Plaintiff's mental status improved somewhat, with no "psychomotor retardation," normal behavior, cooperative demeanor, normal speech, stable mood, full range and appropriate affect, logical thought processes and content, and was fully oriented, with normal memory, attention and concentration, age-appropriate fund of knowledge, excellent impulse control, good insight, and fair judgment. (AR 297.) Ms. Seruby opined Plaintiff had historical and current psychosis, mild paranoia, and a history of non-compliance with medication but did not opine to any particular diagnosis. (AR 297-98.) She assigned Plaintiff a GAF score of 51-60, reflecting only moderate symptoms. (AR 298.) Plaintiff stated he was willing to follow her recommended treatment plan, including regularly taking his prescribed medications and ceasing cannabis and alcohol use. (AR 297.)

On January 5, 2010, Dr. Sreekanth Chava, M.D., examined Plaintiff after he referral by Ms. Seruby. (AR 302-07; 427-32.) Plaintiff displayed good social skills, reported having many friends, and told Dr. Chava that he had not undergone psychological testing. (AR 304.) Plaintiff reported smoking cigarettes and consuming alcohol regularly, and smoking one to two "blunts" of marijuana daily a year and a half. (AR 304.) On examination, Plaintiff was appropriately dressed but disheveled; had psychomotor agitation; talked and laughed to himself; was hyperverbal, disorganized, and anxious with blunted affect; had paranoid ideation with ideas of reference and hallucinations, distractible attention, and poor impulse control, insight, and judgment; was aloof and fully oriented; and had normal concentration, intact memory, and an age-appropriate fund of knowledge. (AR 305.) Dr. Chava diagnosed psychosis not otherwise specified (NOS) with "polysubstance abuse vs. dependence" and ruled out substance-induced psychotic disorder. (AR 305.) Dr. Chava assigned Plaintiff a GAF score of 41-50, reflecting "serious symptoms." (AR 305.) Plaintiff agreed to take his Seroquel and enrolled in outpatient group therapy. (AR 306.)

On January 8, 11, and 12, 2010, Plaintiff participated in intensive outpatient group therapy with Drs. Shoujie Zhang, M.D., and Diane Kawagoe, Ph.D. (AR 308- 17; 318-22; 323-31; 433-

41.)  Plaintiff had "good response to medication" (AR 320) and his condition "significantly improved" with treatment (AR 320).  (*See* AR 305 (GAF score of 41-50 on January 5th); 321 (GAF score of 51-60 on January 11th ); 326 (GAF score of 61-70 on January 12th).  On January 12, 2010, Plaintiff denied hallucinations but was observed to be "very guarded" and "appeared to be responding to internal stimuli throughout interview, often smiling, but unwilling to share thoughts or feelings fueling smile[.]"  (AR 326.)  On January 15, 2010, Dr. Zhang increased Plaintiff's Seroquel's dosage after Plaintiff's mother reported he was talking to himself more and more easily irritable and angry.  (AR 332.)

On January 26, 2010, Plaintiff reported becoming "sedated and verbally aggressive" and seeing "eye particles" on Seroquel so Dr. Chava changed his prescription to Risperdal, another anti-psychotic medication.  (AR 334-37; 442-45.)  Plaintiff's mother reported Plaintiff "paced back and forth" and "continue[d] to talk and smile to himself, stare at the walls, [and got] distracted easily during conversation" but was now sleeping for up to 10 hours.  (AR 335).  Plaintiff's academic functioning, family relations, and peer relations were all "impaired."  (AR 335.)

On examination, Plaintiff talked and laughed to himself a few times; expressed anxious mood, halting speech, disorganized thought process, paranoid ideation and hallucinations; and was noted to have distractible attention and poor insight.  (AR 335.)  Plaintiff was, however, also observed to be well-groomed and appropriately dressed, exhibited normal behavior, had congruent mood, was fully oriented, and had normal concentration, intact memory, age appropriate fund of knowledge, and "improving" impulse control and judgment.  (AR 335.)  Dr. Chava again assigned a GAF score of 41-50.  (AR 336.)

Plaintiff cancelled his follow-up appointments and was not seen again until April 16, 2010.  (AR 340; 345; 446-47.)   Plaintiff and his mother both reported partial improvement with Risperdal, and Dr. Chava assessed an improved GAF score of 51-60.  (AR 345-48; 448-51.)  Plaintiff refused a urinary drug screen (UDS), though he denied substance abuse.  (AR 346.)

Plaintiff was next seen on January 20, 2011, reported smoking five to six cigarettes each day and smoking marijuana once a week, and denied abusing other substances.  (AR 355.)

1    Plaintiff reported good response to medication, and Dr. Chava noted a pleasant demeanor, lack of

2    psychomotor abnormalities, positive (euthymic) mood, no evidence of hallucinations, full

3    orientation, attention and concentration within normal limits, and fair impulse control, insight and

4    judgment on examination.  (AR 356.)  Dr. Chava assigned Plaintiff a GAF score of 71-80 for

5    "transient symptoms," assessed psychosis and cannabis abuse, and ruled out substance-induced

6    psychotic disorder.  (AR 356.)

7         Plaintiff was next seen on September 13, 2011, and reported he had not taken his anti-

8    psychotic medication for five to six months but had continued smoking cannabis on a daily basis.

9    (AR 364.)  Plaintiff's mother claimed he was talking to himself and throwing things "randomly"

10   in his room while unmedicated.  (AR 364.)  His mother reported experiencing psychotic

11   symptoms including paranoid delusions, auditory hallucinations, auditory "command"

12   hallucinations, thought blocking, and disorganized behavior.  (AR 364.)  Plaintiff had stopped

13   smoking cannabis two weeks prior and had resumed taking his medication three days before the

14   visit, and his mother reported a slight improvement in his symptoms.  (AR 364.)

15        Plaintiff "report[ed] multiple voices, talking between themselves, at time single voice

16   'doing running commentary,' worried that people are reading his mind and trying to do 'mean

17   things.'"   (AR 364.)   Plaintiff reported "psychosis including hallucinations, delusions,

18   disorganized speech, inappropriate affect, paranoia, thought blocking, thought insertion, and

19   thought broadcasting, and "denied suicidality, homicidality, current substance use, command

20   auditory hallucinations, or access to weapons."  (AR 364-65.)   Plaintiff appeared "fidgety,"

21   guarded and distracted, with halting speech, anxious mood, disorganized thought process,

22   paranoid ideation, delusions, and hallucinations, and was seen talking to himself.  (AR 364.)

23   Plaintiff had a congruent affect; was fully oriented; had normal concentration, intact memory, age-

24   appropriate fund of knowledge; and had fair impulse control, insight and judgment.  (AR 364.)

25   Dr. Chava assigned a GAF score of 41-50 reflecting "serious symptoms," assessed psychosis and

26   cannabis abuse, ruled out substance induced psychotic disorder, and ruled out paranoid type

27   schizophrenia.  (AR 365.)  Dr. Chava further opined Plaintiff "present[ed] with ongoing psychotic

28   sym[ptoms] in the setting of treatment noncompliance and substance abuse" and increased

1    Plaintiff's Risperdal to treat psychosis.  (AR 365.)

2           Plaintiff participated in intensive outpatient group therapy in September through October
3    2011.  (*See* AR 368- 417.)  Plaintiff's first therapy session, led by Dr. Firoz Bashirahmed Munshi,
4    M.D., took place on September 14, 2011.  (AR 368-77.)  Plaintiff initially reported "extreme
5    paranoia," felt uncomfortable, and refused to talk with Dr. Munshi, insisting that he could only
6    talk with Dr. Chava.  (AR 368.)  Plaintiff reported ceasing smoking marijuana, but Dr. Munshi
7    considered this report "debatable."  (AR 368.)  Plaintiff's mother reported he had flushed his
8    medications  down  the  toilet  three  months  earlier  and  was  not  sleeping  well  and  suspected
9    Plaintiff's friends were supplying him with marijuana.  (AR 369.)

10          Plaintiff was not talkative and Dr. Munshi suspected "underlying paranoid thinking," but
11   he was observed to be alert and oriented; dressed appropriately though disheveled; had normal
12   concentration, normal speech rate, volume and tone, and fair mood with restricted affect; linear,
13   logical,  and  goal-directed  though  "blocked"  thought  processes;  and  had  intact  memory  and
14   cognition, average fund of knowledge, and fair judgment, insight and impulse control.  (AR 369.)
15   Dr. Munshi updated Plaintiff's risk assessment with "significant psychotic symptoms -- suspected
16   drug abuse" and assessed him with "severe psychotic symptom co-morbid with cannabis abuse as
17   well  as  medication  non-compliance  issues."    (AR  369.)    Plaintiff  reported  resuming  his
18   medications and ceasing smoking marijuana, denied suicidal or homicidal ideation, intention or
19   plan, and was not considered a candidate for involuntary hospitalization.  (AR 370.)  Dr. Munshi
20   assigned Plaintiff a GAF score of 51-60, reflecting moderate symptoms.  (AR 370.)

21          Plaintiff actively participated in another group therapy session led on September 14, 2011,
22   by JoAnn Carroll, M.F.T.  (AR 370-77; 461-65.)  Plaintiff behaved "normally," was pleasant and
23   cooperative, provided good insight and engagement, was "hopeful about the future," and reported
24   attending adult high school to obtain his GED.  (AR 370-74.)  Plaintiff admitted smoking
25   marijuana daily for the past year, and told Ms. Carroll he had quit one week and ten days prior.
26   (AR 374; *see also* AR 385 (positive September 11, 2011, drug test for marijuana use).)

27          Plaintiff reported his audio hallucinations had returned after he flushed his medication
28   down the toilet one month before the therapy session.  (AR 374.)  On examination, Ms. Carrol

1   noted no abnormal findings, observing good impulse control, insight, and judgment, and a normal

2   range of concentration.  (AR 376.)  Ms. Carroll assessed Plaintiff as presenting a "low" risk and

3   assigned Plaintiff a GAF score of 51-60, reflecting moderate symptoms.  (AR 376.)

4        On September 16, 2011, Plaintiff attended another group therapy session led by Dr.

5   Kathleen Friedland, Ph.D.  (AR 378-80.)  Plaintiff actively participated, reported feeling better,

6   measuring himself at "10 on a 10 point scale," and expressed enthusiasm about life, the way "he

7   used to feel" before the onset of his schizotypal symptoms.  (AR 378-79.)  Plaintiff denied

8   auditory hallucinations and on examination was noted to have good impulse control and insight,

9   pleasant demeanor, and no abnormal symptoms or behavior.  (AR 378-79.)  On September 19,

10   2011, Plaintiff was the first to share in the group, reported an improvement in sleep and mood, and

11   said that the "only thing" causing distress was quitting smoking cigarettes.  (AR 381.)  Plaintiff

12   reported ceasing marijuana use, exhibited increased focus and attention, smiled, and appeared to

13   be "in a positive mind set."  (AR 381.)  Ms. Carroll assigned Plaintiff a GAF score of 61-70,

14   reflecting "mild symptoms" (AR 381.)

15        On September 21, 2011, Dr. Chava examined Plaintiff and found his symptoms

16   "significantly improved."  (AR 384-86.)  Plaintiff slept and ate well; denied any audio or visual

17   hallucinations, paranoia, delusions, other psychotic symptoms or "any other concerns;" and found

18   stopping cannabis use and taking his medication helpful.  (AR 385.)  On examination, Dr. Chava

19   noted no abnormalities and observed Plaintiff to be "significantly better from the last visit" and

20   Plaintiff's impulse control, insight and judgment to have improved.  (AR 385.)  Dr. Chava

21   assigned Plaintiff a GAF score of 51-60, reflecting moderate symptoms.  (AR 385-86).

22        On September 27, 2011, Plaintiff was an active participant in group therapy and reported

23   responding well to treatment, sleeping well, "optimism, and an above-average mood."  (AR 389.)

24   On examination, Amany Issa Hararah, psychologist trainee, noted no abnormalities in Plaintiff's

25   mental status and assessed Plaintiff as "no" risk.  (AR 389-90.)  On October 7, 2011, Plaintiff

26   again reported responding well to treatment, sleeping well, optimism, and an above average mood,

27   endorsing a "5 signifying great for feeling/thoughts about oneself, home and work environment on

28   the adult check in form."  (AR 394-95.)  However, during the group session Plaintiff was also

7

1  observed to smile to himself and "appeared distracted by external stimuli." (AR 395.)

2       On October 10, 2011, Dr. Patel observed Plaintiff's "symptoms of psychosis have

3  significantly improved over [the] last several weeks." (AR 398.)  Plaintiff denied auditory

4  hallucinations, visual hallucinations, paranoia, delusions, or other psychotic symptoms; denied

5  substance use for prior several weeks; and reported eating well, sleeping well, and being "happy

6  with the improvements with current treatment." (AR 398-99.)  Dr. Patel assessed a GAF score of

7  70-80, reflecting "mild symptoms" (AR 400).   That same day, however, Elaine Ingham

8  Schomaker, LCSW, noted Plaintiff was "very restless" in the group therapy session, having run

9  out of Ativan a few days prior, and reported having had a "fantastic" weekend though his parents

10  "are just glad [he] lived through the weekend." (AR 401.)  Plaintiff "admitted when he hears the

11  voices, he responds to them 'telling me what to do'" and admitted "he is never sure what he will

12  do and, many times, the behavior is aggressive with a sense of anger." (AR 401.)  Though the

13  voices never tell him to harm himself, Plaintiff reported being "'terrified' because the voices and

14  images have come back." (AR 401.)

15       On October 21, 2011, Vincenta M. Leigh, R.N., noted Plaintiff reported feeling "great"

16  with group therapy and denied having current hallucinations or bad dreams. (AR 407.)  Plaintiff

17  described symptoms as past occurences and said he "might write a book on all that he has

18  experienced." (AR 407.)  On examination, Plaintiff's mental status was observed to be normal in

19  each category, and his speech, impulse control and insight/engagement were all rated "good."

20  (AR 407; *see also* AR 410-11 (RN discharge summary); 412-13 (MSW maintenance group note).)

21  Based on his improved symptoms, RN Leigh discharged Plaintiff from group therapy. (AR 407.)

22  Plaintiff reported feeling "relieved" to be discharged, noting he had been required to attend

23  therapy longer than the originally ordered two weeks. (AR 407.)

24       On October 26, 2011, during a follow-up examination with Dr. Chava, Plaintiff reported

25  his "symptoms of psychosis have resolved" and denied audial or visual halluciations, delusions, or

26  other psychotic symptoms. (AR 414-15; 466-67.)  Plaintiff's mother reported Plaintiff had

27  improved, and Dr. Chava assigned a final GAF score of 71-80, reflecting "transient symptoms."

28  (AR 415-16; 467-68.)

On January 4, 2012, agency reviewing psychologist Dr. Celine Payne-Gair, Ph.D., reviewed Plaintiff's records and diagnosed Plaintiff with "schizophrenic, paranoid and other functional psychotic disorders" and "drug, substance addiction disorders," both "severe." (AR 64.)  Dr. Payne-Gair determined[4] Plaintiff did not meet the "Paragraph B" criteria because he exhibited only "moderate" difficulties in maintaining social functioning and concentration, persistence and pace, and had only "one or two" episodes of decompensation of extended duration and did not meet the "Paragraph C" criteria.[5]  (AR 65.)

Dr. Payne-Gair opined that before age 18, Plaintiff had psychosis and "polysubstance abuse vs. dependence," and "substance induced psychosis."  (AR 65.)  After age 18, Dr. Payne-Gair opined Plaintiff had psychosis and cannabis abuse; both resolved as of October 26, 2011, based upon Plaintiff's treating record and self-reports of ceasing cannabis use, and ruled out substance induced psychosis.  (AR 65.)  Dr. Payne-Gair concluded that Plaintiff's allegations, symptoms and statements regarding severity of his symptoms were only partially credible, as the allegations were not fully supported by Plaintiff's activities of daily living; the location, duration, frequency and intensity of his symptoms; and Plaintiff's successful treatment with medication. (AR 65-66.)

Dr. Payne-Gair opined Plaintiff had understanding and memory limitations, as he was "moderately limited" in his ability to understand and remember detailed instructions, but would not have significant limitations in his ability to remember locations and work-like procedures or

---

[4]     After one or more medically determinable mental impairments have been found (*i.e.* the "Paragraph A" criteria), the "Paragraph B" and "Paragraph C" criteria determine if the resulting functional limitations are sufficiently severe to make that individual incapable of working.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00.  For schizophrenia and paranoid disorders, the required level of severity is met when an applicant has "marked" limitations in at least two areas, including activities of daily living, social functioning, concentration, persistence or pace, and repeated episodes of decompensation.  *Id*. at § 12.03(B).  "Repeated" episodes of decompensation means three episodes within 1 year, or an average of once every four months, with each episode lasting at least two weeks.  *Id*. at § 12.00(C)(4).

[5]     For schizophrenia and other paranoid disorders, Paragraph "C" requires a medically documented history of chronic schizophrenic, paranoid, or other psychotic disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, and requires, with symptoms or signs currently attenuated by medication or psychosocial support, and either: (1) repeated episodes of decompensation, (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) current history of one or more years inability to function outside of a highly supportive living arrangement, with an indication of continued need for such an arrangement. Id. at § 12.03(C).

understand and remember short and simple instructions.  (AR 66.)  She further opined Plaintiff would have sustained concentration and persistence limitations because he would be "moderately limited" in his ability to maintain attention and concentration for extended periods and carry out detailed instructions.  (AR 66-67.)  Dr. Payne-Gair found Plaintiff moderately limited in his ability to get along with the general public, accept instructions and respond appropriately from supervisors, and get along with coworkers and peers without distracting them or exhibiting behavioral extremes.  (AR 67.)  She further found Plaintiff was not significantly limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without supervision, work in coordination with others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (AR 67-68.)  Dr. Payne-Gair opined Plaintiff was "moderately limited" in his ability to respond to changes in the work setting, but was not limited in his ability to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, or to set realistic goals or make plans independently of others.  (AR 67-68.)  Dr. Payne-Gair concluded Plaintiff retained the mental functional capacity to understand and remember simple instructions, complete simple tasks, maintain attention and concentration for periods of at least two hours and complete a normal workday and workweek at a consistent pace, relate appropriately to peers and supervisors as needed, and adapt to routine workplace changes.  (AR 68.)

On June 14, 2012, Dr. Zhang again examined Plaintiff.  (AR 482-87.)  Plaintiff reported that he was "doing better" and that his auditory hallucinations and delusions were "well controlled" with Risperdal, his sleep was "getting better" with Trazodone, and his "anxiety and worry" were being treated with Ativan.  (AR 483.)  Plaintiff denied using cannabis since November 2011, and reported he was "thinking about getting a job in the medical field and wanting to have dat[ing] relationship[s] with others."  (AR 483.)  On examination, Plaintiff appeared well-groomed and healthy, pleasant and cooperative, with normal speech, restricted affect, logical thought process and goal directed thought content, with fair impulse control,

1   excellent insight, and good judgment.  (AR 484.)  Dr. Zhang assessed Plaintiff with "psychotic

2   disorder in remission" and with a GAF score of 61-70, reflecting "mild symptoms."  (AR 485.)

3        On August 3, 2012, agency reviewing physician Dr. F.L. Williams, M.D., reviewed

4   Plaintiff's medical records, including the additional June 2012 records from Dr. Zhang, and

5   concluded no consultative examination was necessary.  (AR 78.)  Dr. Williams noted Plaintiff's

6   auditory hallucinations and delusions were well-controlled with Risperdal, his sleep was improved

7   with Trazodone, his anxiety was treated with Ativan, and his last use of marijuana was in

8   November 2011.  (AR 79.)  Dr. Williams concurred for the most part with Dr. Payne-Gair's

9   assessment, opining that Plaintiff can relate appropriately to peers and supervisors as needed and

10  can adapt to routine workplace changes.  (*See* AR 80-83.)  Dr. Williams concluded Plaintiff fell

11  under Medical Vocational Guidelines Rule 204.00, for an individual of any age, education, and

12  skill level, to determine Plaintiff was capable of performing the requirements of representative

13  occupations of laundry worker I, Dictionary of Occupational Titles ("DOT") 361.684-014, drier

14  operator (can & preserve), DOT 523.685-062, and kapok/cotton machine operator (textiles), DOT

15  689.685-082.  (AR 83.)

16       On January 4, 2013, Dr. Chava again examined Plaintiff.  (AR 495-99.)  Plaintiff presented

17  with full remission in psychosis and cannabis abuse, and rule out substance-induced psychotic

18  disorder.  (AR 497-98.)  Plaintiff reported he avoided cannabis and other substances and had

19  thought about going back to school and completing his GED.  (AR 496.)  On examination,

20  Plaintiff appeared healthy and appropriately dressed, pleasant and cooperative, with normal

21  speech, mood congruent affect, logical thought process and normal thought content, attention and

22  concentration within normal limits, age appropriate impulse control, and improving insight and

23  judgment.  (AR 496-97.)  Dr. Chava assessed Plaintiff with a GAF score of 71-80, reflecting

24  "transient symptoms."  (AR 497.)

25  **B.    Testimony**

26       **1.    Plaintiff's Self-Assessments**

27       On November 29, 2011, Plaintiff completed an adult function report, stating that on an

28  average day he takes medication, showers, get dress, eats breakfast, attends GED classes for two

hours, exercises or watches television, eats lunch, naps or does homework, takes medication, and goes to sleep.  (AR 244.)  He has difficulty concentrating and functioning, and cannot "do things" quickly because his "thoughts [are] scattered/voices interfere."  (AR 245.)   He cannot sleep without medication, and needs reminders to dress, bathe, and care for his hair.  (AR 245.)  Plaintiff also wrote that "He would forget to eat."  (AR 245.)  His mother usually prepares his food, though he can heat prepared food or make sandwiches, and he sometimes refuses to eat because the food "might be tainted."   (AR 246.)   He only takes out the trash because he either forgets or "memory/voices get in way with other stuff."  (AR 246-47.)

Plaintiff reports his medication "has [him] stable enough to go out without seeing a threat to self or others" but that he cannot go without his medication.  (AR 247.)  He is unable to shop by himself, but can accompany his mother or others to go shopping.  (AR 247.)  Prior to being medicated, he "was unable to focus even enough to watch [television]" and reported that "medication stabilizes [him]."  Plaintiff mostly only socializes with family, and goes out regularly to the gym and to school.  (AR 248.)

Without medication, Plaintiff reported having "tantrums" and "violent fits," having difficulties being around his family, staying in his room "a lot," and coming out of his room only to eat or use the bathroom.  (AR 249.)  Plaintiff reported difficulties with memory, hearing, concentrating, completing tasks, understanding, following instructions, and getting along with others because, among other things, "the voices cause confusion."  (AR 249.)  He can pay attention for 1-2 hours, sometimes finish a task he started, follow written instructions so long as he can refer back to them throughout the activity, and cannot follow spoken instructions "as well" because he has to be walked through the activity.  (AR 249.)  He does not handle stress or changes in routine well, and while his "medications have helped in stabilizing [his] symptoms [he is] unable to keep under control without them."  (AR 251.)

**2.     Third-Party Assessments**

On November 28, 2011, Plaintiff's mother Concepcion Ontiveros completed a third-party adult function report, stating that on an average day Plaintiff takes medicine for his schizophrenia and sleep, showers, dress, and eat simple meals.  (AR 232.)  On those days he attends school, she

takes him.  (AR 232.)  Plaintiff enjoys watching music videos or movies, tries to read, and exercises.  (AR 232.)  He will forget or ignore his personal hygiene "to the point of being very uncared for: long beard, clothes worn for weeks, etc."  (AR 233.)  Plaintiff has difficulty sleeping because of "delusions and voices."  (AR 233.)  He requires reminders to take care of himself and take his medications, and will sometimes forget to eat or will leave things on the stove.  (AR 233-34.)

Plaintiff takes the trash out each week, but requires reminding because "his mind doesn't do long term."  (AR 234.)  Plaintiff does not drive because he "has trouble remembering or focusing" and is "afraid he will get in [an] accident."  (AR 235.)  Ms. Ontiveros takes care of Plaintiff's expenses and reports that he "doesn't have a good concept" of money.  (AR 235-36.)  He does not engage in social activities outside of spending time with family, though he goes to school and to the gym regularly.  (AR 236.)

Before being stabilized on medication, Plaintiff "would get agitated, very aggressive" and "wanted to fight anyone walking down the street."  (AR 237.)  Plaintiff is not as social as he was before the onset of symptoms, and stays in his room "a lot" and is "afraid to sleep."  (AR 237.)  Ms. Ontiveros confirmed difficulties with memory, completing tasks, concentrating, understanding and following instructions, and getting along with others, and reported that while medicated Plaintiff can maintain attention for 1-2 hours.  (AR 237.)  He can follow written instructions so long as he has them handy for constant reference, but cannot follow spoken instructions well because "he forgets" and "thoughts/voices get him mixed up."  (AR 237.)  Plaintiff tolerates authority figures but does not handle stress or changes in routine well.  (AR 238.)

Ms. Ontiveros concluded that

> . . . my son was a very smart, athletic kid who took care of what he did and how he looked.  He was very laid back and mellow, never spoke back and well mannered.  When his illness began when he turned 16, I didn't recognize him.  He changed to a complete stranger.  The medicine has helped bring him close to how he was before but his memory and his abilities are not the same.

(AR 239.)

//

13

On July 12, 2013, Plaintiff's uncle Camilo Ontiveros, Jr., wrote a letter at Ms. Ontiveros' request.  (AR 282.)  Mr. Ontiveros stayed with Plaintiff during the time Plaintiff had his first "episode," when he ceased being able to recognize himself in mirrors and began hearing voices from within his head and from inanimate objects.  (AR 282.)  Though stabilized on medications, Plaintiff is "not the same child" Mr. Ontiveros once knew.  (AR 282.)  Plaintiff's "short term memory is gone," he stays inside and becomes paranoid about strangers in public, and sometimes refuses his medication, claiming he is better and flushes his medications down the toilet. (AR 282.)  Mr. Ontiveros did not believe Plaintiff could hold a job "even some place like [M]c [D]onalds" because even McDonalds "would not be willing to retrain someone everyday on the same tasks when they can find someone they can teach once."  (AR 282.)

**3.   Hearing Testimony**

**a.   Plaintiff's Testimony at Hearing[6]**

Plaintiff testified he completed the ninth grade, had not completed his GED, and had never worked.  (AR 33-34.)  Though his mother had applied for work for him, he had never attended a job interview because his "mental symptoms" prevented him from working.  (AR 31-33.)  When asked how he knew he could not work if he had never tried to work, Plaintiff testified that "I feel I don't -- I wouldn't be able to.  I feel, like, it just takes me around even people, like, I have trouble, like just putting things into words."  (AR 33.)  The ALJ asked Plaintiff if he could perform a job in which he did not have to interact with a lot of people, such as assembling small products or putting things in boxes, and Plaintiff responded that he "would be just lost in my thought and just, like, become -- like symptoms.  I -- I don't think I would have the go to just do it on my own, like, I have to have, like, a reminder.  That's what my mom usually does for me."  (AR 33.)

Plaintiff stated Risperdal and Trazodone helped with his symptoms.  (AR 34-35 (reporting that while he still experienced symptoms, they were "not as bad as before").)  He admitted

---

[6]   At a January 24, 2013 hearing, Plaintiff was not present and constructively waived his right to appear through his counsel.  (AR 53-59.)  Plaintiff's counsel testified regarding his assessment of the claim and posed hypotheticals to the VE.  (AR 56-59.)  The ALJ concluded by issuing a notice to show cause as to whether a supplemental hearing should be held.  (AR 59.)  At a supplemental hearing on July 16, 2013, Plaintiff appeared and testified before the same ALJ and a vocational expert (AR 27-51), and apologized for missing the first hearing (AR 45).

drinking alcohol in the past few months and testing positive for marijuana in January 2013. (AR 36.)  Plaintiff denied concentration problems and testified he could follow a simple set of instructions, but claimed he had difficulty recalling things he had been told to do and had trouble making decisions.  (AR 37-38.)  He claimed he tried to stay away from people, so he did not know if he got along with people.  (AR 38.)  Plaintiff also claimed he was experiencing hallucinations, describing them as "sometimes visual but just, like, there," "sometimes ugly things and I just try to concentrate on what's in front of me," and "just things that I don't know but they make sense to me."  (AR 39.)

Plaintiff reported waking up, sleeping in, eating, writing things down, and occasionally reading on a typical day, but testified that he mostly lay in bed, thinking, "because of the hallucinations."  (AR 39; 43.)  Plaintiff slept well with the help of medication and took occasional naps.  (AR 39-40.)  Plaintiff claimed he needed to be reminded to bathe, but did his own laundry, cooked, washed dishes, helped care for a dog and two turtles, and would clean the bathroom or kitchen when asked.  (AR 40; 43.)  He does not go to the grocery store or do other shopping and rarely goes to movies, has no friends, and does not engage in athletic activities.  (AR 41.)  Plaintiff once attended a large concert/festival with his aunt and cousin in 2012, which was "fun" but "crowded," but does not go to the mall or take walks.  (AR 42.)

Plaintiff watches television for brief periods, but prefers to read books because he is "not sure if he would get the whole story" if he tried to watch television for a full hour.  (AR 43-44.) Plaintiff spends time thinking about "conspiracy stuff" and spends "hours" each day writing his thoughts in notebooks.  (AR 44.)  Writing things down calms him, and he becomes aware he is becoming anxious when someone tells him he is "pacing."  (AR 44-45.)

### b.     Plaintiff's Mother's Testimony at Hearing

Ms. Ontiveros testified that Plaintiff's doctor had found him to be in remission.  (AR 46.) She, however, did not believe Plaintiff was in remission because he still forgot things, was "useless" unless she told him what to do, and still heard and saw things (AR 46-47).  She claimed her son was not "the way he used to be but this is how he's going to be so this is probably good." (AR 46.)  Ms. Ontiveros also testified Plaintiff could maintain personal hygiene after being

15

1  reminded.  (AR 47-48.)  Finally, she testified that she believed a potential employer would not

2  want to train him every day, and would have to "constantly remind him every day this is what

3  you'll have to do to earn your pay and I don't even think McDonald's would do that." (AR 48.)

4             **c.     Vocational Expert Testimony at Hearing**[7]

5          Noting that Plaintiff had no prior work history, the ALJ asked the Vocational Expert

6  ("VE") to consider a hypothetical individual of Plaintiff's same age, education, and lack of work

7  history, "able to work at all exertional levels but [ ] limited to simple, routine tasks, able to relate

8  appropriately to others and adapt to changes."  (AR 49.)  The VE agreed that such an individual

9  would be able to perform "the world of unskilled work." (AR 49.)  The ALJ then asked whether

10 an individual who "would be off task at least 20 percent of the time due to mental symptoms"

11 would be precluded from working, and the VE agreed such an individual could not work.

12 (AR 49.)

13         The ALJ then asked the VE whether a hypothetical individual who is able to work at all

14 exertional levels, who is able to relate appropriately to others and adapt to changes but is limited to

15 simple, routine tasks and is limited to work in a non-public setting with only occasional interaction

16 with coworkers, would be able to work.  (AR 49.)  The VE testified that such an individual would

17 be able to perform the work requirements of representative occupations including tin stacker, DOT

18 922.687-098, heavy work with an SVP level of 1,[8] box bender, DOT 641.687-010, medium work

19 with an SVP of 1, and bottle line attendant, DOT 920.687-042, light work with an SVP of 1.

20 (AR 50.)  Finally, the VE agreed that an individual who would miss two or three days of work per

21 month would be unable to work.  (AR 51.)

22         Plaintiff's counsel asked the VE whether an individual who "could not interact

23 appropriately with supervisors, coworkers or the general public and would need even simple

24 repetitive one-to-two step instructions repeated throughout the day, day after day," would be able

---

[7]    The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and its companion publication, the Selected Characteristics of Occupations ("SCO"), except where he explained any inconsistency.  (AR 50.)

[8]    Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

1   to work.  (AR 51.)  The VE testified such an individual would be unable to work.  (AR 51.)

2   **C.      Administrative Proceedings**

3        On September 10, 2013, the ALJ issued a written decision and found that Plaintiff had a

4   severe impairment of schizophrenia.  (AR 15.)  The ALJ determined that this impairment did not

5   meet or equal a listed impairment.   (AR 15.)   The ALJ found Plaintiff retained the residual

6   functional capacity ("RFC") to perform a full range of work at all exertional levels, "would be

7   capable of performing simple routine tasks and able to adapt to changes, but is limited to work in

8   nonpublic setting[s] with occasional interaction with co-workers."  (AR 16.)

9        After considering Plaintiff's age, limited education, work experience, and RFC, the ALJ

10  determined there were jobs existing in significant numbers in the national economy Plaintiff could

11  perform, including representative occupations stock worker, DOT 922.687-098, heavy unskilled

12  work representing 94,980 jobs in California, box bender, DOT 641.687-010, medium unskilled

13  work representing 9,764 jobs in California, and bottling line attendant, 920.687-042, light

14  unskilled work representing 45,151 jobs in California (AR 19.)  The ALJ therefore concluded that

15  Plaintiff was not disabled under the Social Security Act.  (AR 19.)

16       The Appeals Council denied Plaintiff's request for review on March 19, 2015, making the

17  ALJ's decision the Commissioner's final determination for purposes of judicial review.  (AR 1-4.)

18  **D.      Plaintiff's Complaint**

19       On May 26, 2015, Plaintiff filed a complaint before this Court seeking review of the ALJ's

20  decision.  (Doc. 1.)  Plaintiff argues that the ALJ erred by failing to fully develop the record and

21  by improperly disregarding lay testimony.  (Doc. 15.)

22                    **III.    SCOPE OF REVIEW**

23       The ALJ's decision denying benefits "will be disturbed only if that decision is not

24  supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

25  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

26  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

27  Instead, the Court must determine whether the Commissioner applied the proper legal standards

28

1  and whether substantial evidence exists in the record to support the Commissioner's findings. *See*

2  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

3         "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

4  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).   "Substantial evidence" means "such

5  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

6  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

7  305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

8  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

9  may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

10  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

11                              **IV.    APPLICABLE LAW**

12         An individual is considered disabled for purposes of disability benefits if he is unable to

13  engage in any substantial, gainful activity by reason of any medically determinable physical or

14  mental impairment that can be expected to result in death or that has lasted, or can be expected to

15  last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

16  1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

17  impairments must result from anatomical, physiological, or psychological abnormalities that are

18  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

19  such severity that the claimant is not only unable to do his previous work, but cannot, considering

20  his age, education, and work experience, engage in any other kind of substantial, gainful work that

21  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

22         The regulations provide that the ALJ must undertake a specific five-step sequential

23  analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the

24  claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b),

25  416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe

26  impairment or a combination of impairments significantly limiting her from performing basic

27  work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines

28  whether the claimant has a severe impairment or combination of impairments that meet or equal

the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled. *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

Plaintiff contends the ALJ erred by failing to fully develop the record and by improperly disregarding lay testimony.  (Doc. 15.)

### A.   The ALJ's Consideration of the Medical Evidence

Plaintiff contends the ALJ failed to fully develop the record, relying on insufficient evidence of Plaintiff's "functionality in the areas of concentration, focus, and ability to understand and carry out instructions" to formulate the mental RFC assessment.  (Doc. 15, p. 11.)   The Commissioner responds that the ALJ had no duty to supplement the record by ordering a consultative examination because the record was fully developed and unambiguous.  (Doc. 21.)

#### 1.   Legal Standard

"In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (citation omitted).  "The ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005).  "One of the means available to an ALJ to supplement an inadequate medical record is to order a consultative examination, *i.e.*, 'a physical or mental examination or test purchased for a claimant at the Social Security Administration's request and expense.'" *Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001) (quoting 20 C.F.R. §§ 404.1519, 416.919).

1        **2.      The ALJ's Consideration of the Sufficiency of the Record**

2        Plaintiff contends the ALJ erred in alternatively substituting his own judgment in

3   formulating Plaintiff's RFC and in relying upon a nonexamining, reviewing agency physician to

4   find that Plaintiff had "moderate difficulties" in social function and concentration, persistence, or

5   pace and had experienced one to two episodes of decompensation, each of extended duration.

6   (Doc. 15, p. 11 (citing AR 15-16).)  Plaintiff asserts that "without a consultative examination, the

7   evidence is insufficient to make an informed disability determination."  (*Id.* (citing *Penny v.*

8   *Sullivan*, 2 F.3d 953, 958 (9th Cir. 1993), *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal.

9   2006).)  Plaintiff's contentions are meritless.

10       As an initial matter, the Court agrees with the Commissioner's observation that Plaintiff

11  presents an argument that can be characterized, at best, as lacking in specificity and analysis.

12  (Doc. 21, n.12.)  It is within the Court's discretion to reject this argument *ab initio*, *see Hibbs v.*

13  *Dep't of Human Res.*, 273 F.3d 844, 872 (9th Cir. 2001) *aff'd sub nom. Nevada Dep't of Human*

14  *Res. v. Hibbs*, 538 U.S. 721 (2003) ("We therefore cannot grant relief [on this] argument, because

15  he has failed to develop the record and his argument sufficiently to render it capable of assessment

16  by this court"); however, the Court is unwilling to so prejudice Plaintiff's right to redress in the

17  court as to dismiss this argument without discussion.  The Court will therefore address Plaintiff's

18  contention only to the extent that he has provided some reference and citation to the record.  *See*

19  *Indep. Towers of Washington v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our circuit has

20  repeatedly admonished that we cannot manufacture arguments for an appellant and therefore we

21  will not consider any claims that were not actually argued in appellant's opening brief") (internal

22  quotations and citations omitted); *see also Aceves v. Colvin*, No. 1:14-CV-01907-SMS, 2016 WL

23  1267384, at *6 (E.D. Cal. Mar. 31, 2016).[9]

24       To the extent that Plaintiff argues the ALJ erred by creating an RFC assessment because

25  "an ALJ is not a physician and does not possess the requisite expertise to provide an opinion about

26  a plaintiff's <u>functional capacity</u> based on his or her lay interpretation of treating records (Doc. 15,

27  ───────────────────────
28  [9]    The undersigned further advises counsel that to the extent fees are sought pursuant to 28 U.S.C. § 2412(d)(1)(A)
(the Equal Access to Justice Act) or 42 U.S.C. § 406(b)(1)(A), such request for attorneys' fees specifically seeking to
recover for preparation and argument of this section of Plaintiff's brief will <u>not</u> be entertained.

p. 10 (emphasis in original)), the law is well settled that it is the ALJ's job to consider and evaluate medical opinion evidence and assimilate the evidence into a comprehensive RFC assessment.  *See* 20 C.F.R. §§ 404.1527(b), 416.927(b) (2011) ("In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive") and §§ 404.1527(d), 416.927(d) ("Regardless of its source, we will evaluate every medical opinion we receive").  Consequently, no error occurred.

Next, to the extent that Plaintiff argues that the ALJ erred by relying on any substantive examination because "an ALJ has the statutory obligation to make 'every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual [RFC]'" (Doc. 15, p. 10-11), this argument lacks merit.  Drs. Payne-Gair and Williams are *precisely* the types of psychological specialists which are required by the statutes.  (AR 64-69; 78-83.)  Both opinions were granted "great weight" by the ALJ in reaching his disability determination (AR 17), indisputably contradicting Plaintiff's contention that the ALJ substituted his own opinion in place of that of an appropriate medical professional (Doc. 15, p. 11).  Moreover, the ALJ did not rely on the two reviewing physicians' opinions alone; rather, the ALJ based his RFC assessment on a synthesis of a well-developed, consistent, exhaustive five-year medical record from treating physicians Patel (AR 285-93; 398-401), Chava (AR 302-07; 334-37; 363-67; 414-17; 495-99), Zhang and Kawagoe (AR 308-31; 482-87), Munshi (AR 368-77), and Friedland (AR 378-80), numerous nurses and social workers, *and* the two reviewing agency physicians.  There was more than enough medical evidence with the record upon which the ALJ was able to properly base an RFC assessment.

Finally, Plaintiff's contention that "the ALJ was obligated to order a consultative examination to sufficiently evaluate Plaintiff's functional capacity" (Doc. 15, p. 11) is both contrary to law and unsupported by the record.  Plaintiff does not cite to a single inconsistency, ambiguity, or insufficiency within the record that would actually trigger the ALJ's duty to supplement the record in any way.  (*See generally*, Doc. 15, pp. 1-14.)  *See* 20 C.F.R. § 416.920b(b) (where the evidence is insufficient or inconsistent, contains an internal conflict, is ambiguous, or medical evidence is not based on medically acceptable clinical or laboratory

diagnostic techniques, the Commissioner weighs the relevant evidence and attempts to determine whether a claimant is disabled based on the evidence she has). Plaintiff's medical record is well-developed, containing medical records over a five-year period from six treating physicians, two reviewing agency psychology specialists, and numerous social workers and nurses. These opinions were generally consistent: not a single treating or nontreating source ever opined Plaintiff was disabled or was not improved with medication (*see* AR 320; 356; 385; 398-99; 407). In fact, Plaintiff was demonstrably improved with compliance with medication, repeatedly denying hallucinations (AR 326; 356; 378; 385; 398; 407; 414; 483), was found to be in full remission (AR 485; 497), and was assessed with GAF scores high enough to reflect only "mild" or "transient" symptoms (AR 400; 416).

As asserted by the Commissioner, "[b]etween multiple consistent medical source opinions and a long history with which to judge Plaintiff's credibility, the existing evidence was sufficient for the ALJ to determine that Plaintiff was not disabled."[10] (Doc. 21, p. 22 (citing 20 C.F.R. §§ 416.945(e), 416.929(c)).) Plaintiff fails to point to a single inconsistency or ambiguity in the record; absence such evidence, the ALJ was under <u>no duty whatsoever</u> to supplement the record in any way pursuant to 20 C.F.R. § 416.917. *See Webb*, 433 F.3d at 687; *Reed*, 270 F. 3d at 841.

In sum, the ALJ did not err by basing his decision on a consistent, developed, and unambiguous record.

**B.      The ALJ's Consideration of Lay Testimony**

Plaintiff contends the ALJ erred in inconsistently crediting Ms. Ontiveros' written testimony regarding Plaintiff's activities and discounting her testimony regarding the effect of Plaintiff's psychosis and anxiety on his memory, concentration, and understanding and completion of tasks. (Doc. 15, p. 12 (citing AR 17).) Plaintiff also contends the ALJ erred in silently rejecting Mr. Ontiveros' testimony without explanation. Doc. 15, p. 12.) The Commissioner responds that the ALJ accorded proper weight to Ms. Ontiveros' testimony insofar as it was

---

[10]     The undersigned makes no finding as to whether Plaintiff is indeed disabled, as the matter is being remanded for reconsideration of lay witness testimony. However, the undersigned again writes to clarify for the record that it is settled for purposes of remand that the record is complete and <u>no</u> supplemental consultative mental examination is necessary to determine whether Plaintiff is disabled.

consistent with the overall record and, to the extent the ALJ did not explain his credibility finding as to Mr. Ontiveros, such error is harmless because such testimony was redundant to other, properly discredited testimony.  (Doc. 21, pp. 26-27.)

### 1.     Legal Standard

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Stout v. Commissioner of Soc. Sec.*, 454 F.3d 1050, 1053 (9th Cir. 2006); *see also* 20 C.F.R. § 416.913(d)(4).  Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).   In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons."  *Lewis*, 236 F.3d at 512.  An ALJ may reject lay witness testimony if it is inconsistent with the record.  *See, e.g., id*. at 511-12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record); *Bayliss v. Barhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (rejecting lay witness testimony conflicting with the medical record). The ALJ may "draw inferences logically flowing from the evidence."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012).

### 2.     The ALJ's Consideration of Ms. Ontiveros' Testimony

The ALJ evaluated Ms. Ontiveros' testimony as follows:

[Plaintiff]'s mother, Concepcion Ontiveros, reported [Plaintiff] watched movies, read, prepared simple meals, took out the trash, went outside daily, walked, watched television, visited with others, and went to the gym and to school.  She also indicated that [Plaintiff]'s condition "affect[s]" certain activities, such as remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others; however, she failed to quantify any such limitations or explain how those areas are affected with the exception of concentrating, which allegedly limited him to one to two hours, which is not consistent with the other evidence of record or even [Plaintiff]'s own testimony.  I

give great weight to [her testimony regarding Plaintiff]'s fairly wide range of daily activities, and give little weight to the affected areas comments.

(AR 17.)  Plaintiff contends the ALJ improperly credited only certain portions of Ms. Ontiveros' testimony.  (Doc. 15, p. 12).  Counsel is reminded that an ALJ is not required to fully credit every portion of a witness's testimony, only those portions which are supported by the record.  *Bayliss*, 427 F.3d at 1218.

The undersigned is unconvinced, however, by the Commissioner's contention that the ALJ provided specific, legitimate reasons for rejecting Ms. Ontiveros' testimony that Plaintiff is only able to concentrate for one to two hours at a time.  The Commissioner explains that this testimony is inconsistent with Plaintiff's treating sources, who "found his concentration within normal limits on at least seven occasions (AR 297, 305, 335, 356, 364, 369, 276)," and the reviewing physician's opinion that Plaintiff had "no limitation in short-term attention and only 'moderate' difficulty in concentration over extended periods (AR 66-67)."  (Doc. 21, p. 26.)  Though the Commissioner is correct that an inconsistency with the medical evidence of record is a valid reason to discount lay testimony, such analysis is only appropriate at Step 2 of the sequential evaluation process, when the ALJ is determining whether a medically determinable impairment exists.  *See Bayliss*, 427 F.3d at 1218.  An ALJ may not reject lay testimony as unsupported by, or inconsistent with, the medical evidence when the lay testimony was given in support of a claimant's subjective limitations at Step 4 and as part of ascertaining the claimant's RFC.  *See Smolen*, 80 F.3d at 1289; *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009); *see also Massey v. Comm'r*, 400 F. App'x 192, 194 n.1 (9th Cir.2010) (holding that ALJ may not reject lay testimony solely because it is not supported by objective medical evidence).

Moreover, Ms. Ontiveros' testimony is not inconsistent when interpreted in light of the remainder of the record.  The Commissioner reasserts that Ms. Ontiveros' estimation of Plaintiff's ability to concentrate for only one or two hours is inconsistent with Plaintiff's own testimony; however, a review of the record reflects that Plaintiff testified he could only concentrate for one to two hours.  (*See* AR 17; 43 (testifying at the hearing that he can follow a half-hour comedy on television but would be unable to "get the whole story" of an hour-long show because he would be unable to concentrate on the show and remember what he had watched); AR 249 (written

testimony that he can pay attention for 1-2 hours, sometimes finish a task he started, follow written instructions only so long as he can refer back to them throughout the activity, and cannot follow spoken instructions "as well" as he can follow written instructions because he has to be walked through the activity).)

On remand, the ALJ must reconsider Ms. Ontiveros' lay testimony as to the limitations imposed by Plaintiff's medically determinable schizophrenia impairment and set forth specific, germane reasons for rejecting her testimony as to how his mental impairment "affects" his ability to work. *See Stout*, 454 F.3d at 1054-56.

### 3.     The ALJ's Consideration of Mr. Ontiveros' Testimony

The ALJ summarized Mr. Ontiveros' testimony as follows:

> [Plaintiff]'s uncle, Camilo Ontiveros, Jr., reported that [Plaintiff] heard voices inside his head and inanimate objects spoke to him, but his medications seemed to help with his symptoms.  He was stable, but his short-term memory was gone, and he was paranoid.  He refused to take his medications and flushed them down the toilet.

(AR 17.)  The ALJ, however, did not make a credibility finding regarding Mr. Ontiveros' above-summarized testimony or Mr. Ontiveros' belief that Plaintiff would be unable to hold a job, "even [at]] some place like [M]c [D]onalds" because even McDonalds "would not be willing to retrain someone everyday on the same tasks when they can find someone they can teach once." (AR 282.)

The Commissioner contends that any error in failing to specify the credit assigned to Mr. Ontiveros' testimony, if any, in formulating the RFC assessment was harmless.  (Doc. 21, pp. 26-27.)  The Commissioner notes that Mr. Ontiveros' testimony is largely redundant of Plaintiff and Plaintiff's mother's own testimony, which were both properly discredited.   (Doc. 21, p. 27.) However, in the absence of any credibility finding by the ALJ, the Court cannot confidently conclude that such error was harmless.  *See Robbins*, 466 F.3d at 885 ("[W]e have only found harmless error when it was clear from the record that an ALJ's error was inconsequential to the ultimate nondisability determination" and have "never found harmless an ALJ's silent disregard of lay testimony about how an impairment limits a claimant's ability to work.") (internal quotations omitted).

The ALJ's silent disregard of Mr. Ontiveros' lay testimony was not harmless error because "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony," and the court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout*, 454 F.3d at 1054-56. Mr. Ontiveros' testimony pertains to Plaintiff's ability to concentrate, understand, and follow even simple instructions and, therefore, was relevant to the ALJ's determination that there were jobs in the national economy that Plaintiff can perform. If credited, this testimony indicates that Plaintiff may be more limited in his ability to understand work-related tasks and work without constant supervision and directions.

The Court is unable to conclude that a reasonable ALJ could not have reached a different disability determination given the limitations described by Mr. Ontiveros. (*See* AR 51 (VE testimony that an individual who "could not interact appropriately with supervisors, coworkers or the general public and would need even simple repetitive one-to-two step instructions repeated throughout the day, day after day," would not be able to work).) On remand, the ALJ must consider Mr. Ontiveros' lay testimony and, if not fully credited, set forth specific, germane reasons for rejecting his testimony. *See Stout*, 454 F.3d at 1054-56.

In sum, the ALJ's articulated reasons were not sufficiently specific nor germane to allow the Court to conclude that he rejected the lay witnesses' testimony on permissible grounds.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence in the record as a whole and remand for reconsideration of lay testimony is warranted. Accordingly, the Court GRANTS Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Michael Ontiveros-Yarbrough, and against Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **August 1, 2016**                          /s/ *Sheila K. Oberto*
                                                      UNITED STATES MAGISTRATE JUDGE